CHARLES E. FENNER and Others, Copartners, Doing Business under the Firm Name and Style of FENNER & BEANE, Plaintiffs, *v.* MONROE J. CAHN and Another, Defendants.

Supreme Court, New York County, January 9, 1933.

*Bouvier & Beale* [*B. F. Norris* and *Frank R. Pitt* of counsel], for the plaintiffs.

*Edward N. Goldey* [*Humphrey J. Lynch* and *Monroe J. Cahn* of counsel], for defendant Cahn.

*Wing & Wing* [*George S. Wing* of counsel], for defendant Kevorkian.

COLLINS, J. In this action, tried by the court without a jury, the plaintiffs, stockbrokers, seek to recover on a guaranty, whereunder the defendant Cahn guaranteed the marginal trading account of plaintiffs' customer, Hagop Kevorkian. Kevorkian was not sued by the plaintiffs. Cahn, however, pursuant to subdivision 2 of section 193 of the Civil Practice Act, has brought him in as a party. Cahn asserts a counterclaim against the plaintiffs, predicated upon the alleged conversion by the plaintiffs of Kevorkian's securities, and asks that, in the event the plaintiffs recover against him (Cahn), judgment be rendered in his favor against Kevorkian.

The plaintiffs having made advances to Kevorkian for the purchase of stocks, there was a debit balance against Kevorkian of $122,672.52, which included interest and commissions. Upon a market recession plaintiffs demanded margin and Kevorkian's secretary (Kevorkian then being in Europe) gave the plaintiffs a check for $15,000, drawn on Kevorkian's account and signed by her under a power of attorney, which check was returned unpaid because of insufficient funds. The demanded margin not being forthcoming, the stocks were sold to prevent further loss, but the sale resulted in a deficit of $2,993.97, which is the amount here claimed. Obviously, the plaintiffs were anxious about Kevorkian's account. Not only did they demand margin but cotemporaneously insisted on assurance of Kevorkian's ability to meet whatever obligation arose by reason of the plaintiffs carrying the account. The $15,000 check was given on June 18, 1930, and the following day Cahn assured plaintiffs in writing that any commitment made by Kevorkian " will be faithfully carried out and that he [Kevorkian] will take care of any obligation that he may incur in connection with any stock which you may buy or sell for his account." The plaintiffs desired that Cahn's assurance be manifested by a formal guaranty. Whereupon, Cahn, on June 20, 1930, and prior to the enforced sale and resultant deficit, executed the following guaranty:

" GENTLEMEN: In consideration of your carrying an account for Hagop Kevorkian and other valuable consideration in hand paid, receipt whereof is hereby acknowledged, I /we herewith warrant, guarantee and otherwise insure you against any and all liability that has and may hereafter rest on you by reason of any losses being sustained in the said account.

" The obligation herein assumed by me /us shall be a continuing one, and shall cover all past and subsequent transactions in said account until I /we notify you in writing that I /we will not be liable on any transactions in said account that may be initiated in said account on and after the dates specified in said notice.

" You may transfer from time to time funds of mine in your possession to said account as you may require.

" (Signed)      MONROE J. CAHN."

It is this guaranty which forms the basis of this action.

Cahn defends upon four grounds: *First*, that the guaranty is not a guaranty against loss but one against liability, and that, since no liability has been established, plaintiffs' case falls. *Second*, that the guaranty is a guaranty of collection and not of payment, and that plaintiffs were obligated to exhaust their remedies against Kevorkian preliminarily to maintaining the present action. *Third*, that the guaranty was given to the plaintiffs' firm as it existed on June 20, 1930, and that having admitted a new partner on July 1, 1930, the firm as it existed on June 20, 1930, *ipso facto* dissolved, thus releasing Cahn's obligation under the guaranty. *Fourth*, that not only did the plaintiffs fail to establish liability of Kevorkian, but that plaintiffs converted the stocks by their wrongful sale, and that Kevorkian was entitled to damages therefor, the stocks having risen in value within a reasonable time after their alleged conversion.

(1) A guaranty is not a peculiar specie of obligation to be viewed differently from other instruments. A guaranty is a contract to be construed by the principles governing other contracts, the guide being the intention of the parties as expressed in the guaranty and illuminated by the setting, fashioned by the adjacent circumstances. The verbiage of the guaranty here, the purpose for which it was given, the object sought to be gained thereby, and the other interpretative circumstances, clearly indicate that the intention of Cahn was to make good any loss which the plaintiffs would sustain as a consequence of carrying Kevorkian's marginal account. Cahn's authorization to the plaintiffs to transfer from time to time funds of his, in plaintiffs' possession, to Kevorkian's account, as plaintiffs may require, sustains the position that the primary security was the stock and that when that security became exhausted, and a deficit ensued, the plaintiffs could call upon Cahn to meet the deficit,

without first resorting to remedies against Kevorkian. (*Wallace* v. *Straus*, 113 N. Y. 238.)

(2) The guaranty being against loss and not against collection only, the loss was established when the primary security, that is, the stocks, were sold, leaving a debit balance. It appears that Kevorkian's obligation to the plaintiffs had accrued at the time of the guaranty.

(3) Patently, the intent was to indemnify the firm of Fenner & Beane against loss occasioned by carrying Kevorkian's marginal account, without regard to the firm's personnel. Obviously, it did not and could not have been of any consequence to Cahn who constituted the partnership. To hold that the mere admission of a new partner terminated Cahn's obligation under the guaranty would frustrate the intention of the parties and would substitute form for substance. Right cannot be outraged by such technical objections. Cahn did not contract with reference to the immutability of the partnership. Actually he was not motivated by any considerations as to the composition of the firm. It was never contemplated that a change in personnel would affect his undertaking. Obligations are not to be destroyed by such minutiæ. In *Richardson* v. *County of Steuben* (226 N. Y. 13), in disposing of an analogous contention, it was said: " The rule that the liability of a surety is to be strictly construed is so often reiterated with a very general sense of its true meaning that we perhaps may profitably recall just what its application is to such a case as this. It does not mean that in interpreting the undertaking of a surety we are to be governed by different fundamental rules than those which are applicable to the construction of another contract. And least of all does it permit us to cast aside the principle applicable to all contracts that in their interpretation we are to seek for the true intent of the parties who executed them. After that intent has been discovered and the meaning of the contract determined, it is of course true that the liability of a surety is to be strictly and rigidly limited by the scope and meaning of the instrument which he has executed. (*People* v. *Backus*, 117 N. Y. 196; *Bennett* v. *Draper*, 139 N. Y. 266.) In ascertaining that intention and construing the language which has been used in a contract of suretyship, as well as in another contract, that language is to be read in the light of the surrounding circumstances. (*People* v. *Backus*, *supra*.) * * *

" We, therefore, reach the conclusion that it was the intent of plaintiff, as measured by his written engagement in the light of surrounding circumstances, to guarantee that the banking institution which received the county deposits for a short time would repay

them and that he never thought of a copartnership and never intended to limit his engagement to the one that so long as Mary H. Hallock and her grandson continued to be copartners and owners of the bank they would fulfill their obligations.

" We have not overlooked the arguments of the respondent based on the wording of the designation of the bank filed by the county treasurer. We think that any significance which might otherwise be drawn from that rather minor and inconclusive circumstance must yield to the larger and more decisive facts and considerations which have been discussed."

I am not impressed by Cahn's argument that the present case presents features making the principle of *Richardson* v. *County of Steuben (supra)* inapplicable. It is the intent and design of the guaranty that must be accorded primary consideration.

(4) The claim of conversion is not made by Kevorkian but by Cahn. Nor does it appear that any action arising out of the alleged conversion has been assigned by Kevorkian to Cahn. That Kevor-. kian, having been brought in as a party by Cahn, could not, in this action, propound a counterclaim for conversion against the plaintiffs, and that he would be limited in his defense to the matters set up in Cahn's claim against him (Kevorkian) is now established. (*Municipal Service Real Estate Co., Inc.,* v. *D. B. & M. Holding Corp.,* 257 N. Y. 423; *Marsh* v. *Standard Accident Insurance Co.,* 141 Misc. 484; *Kelvin Engineering Co., Inc.,* v. *Knott,* 212 App. Div. 413.) Since Kevorkian could not maintain the counterclaim, it is doubtful if Cahn can maintain it. True, the plaintiffs consented to the assertion of the counterclaim, and did not object to testimony in its support. It may be that their opposition to the counterclaim is restricted to its merits. (Civ. Prac. Act, § 278.) Of course, objection that a counterclaim does not state facts sufficient to constitute a cause of action is not waived. (Civ. Prac. Act, § 279.) The counterclaim here is informal and was not advanced until the trial. No reply thereto was interposed. In any event, the consequence of my conclusion that the plaintiffs have sustained a loss implies the holding that there was no conversion, and leads to the result that the counterclaim must be dismissed.

Verdict directed for plaintiffs against defendant Cahn for $2,993.97, with interest from July 16, 1930, together with costs and disbursements, and in favor of the defendant Cahn against the defendant Kevorkian for the same amount. Cahn's counterclaim dismissed. Appropriate exceptions to defendants. Twenty days' stay and thirty days to make a case.