**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Amanda Griffith, Respondent,

v.

ISL Development, LLC and Steven Stewart, Individually,

Of whom Steven Stewart is the Appellant.

Appellate Case No. 2019-000738

———————

Appeal From Charleston County
Jennifer B. McCoy, Circuit Court Judge

———————

Unpublished Opinion No. 2022-UP-277
Heard March 9, 2022 – Filed June 29, 2022

———————

**AFFIRMED IN PART AND REVERSED IN PART**

———————

Capers G. Barr, III, of Barr Unger & McIntosh, LLC, of Charleston, for Appellant.

R. Patrick Flynn, of Pope Flynn, LLC, of Charleston, and Michael Wade Allen, Jr., of Buxton and Collie, LLC, of Mt. Pleasant, for Respondent.

———————

**PER CURIAM:**  In this action to enforce a promissory note (the Note), Appellant Steven Stewart seeks review of the circuit court's order finding Stewart liable as a personal guarantor of a loan made by Respondent Amanda Griffith to ISL Development, LLC (ISL).  Stewart argues:  (1) the evidence does not support the circuit court's finding that there was sufficient consideration for Stewart's guarantee; (2) the attorney's fees award to Griffith was not supported by adequate findings of fact; and (3) the award of interest to Griffith at a specific rate conflicts with section 34-31-20 of the South Carolina Code (2020), which governs the legal rate of interest on money judgments.  The parties have agreed that although California law governs the substantive questions in this case, South Carolina law governs procedural questions.

Because this is an action at law,[1] we will uphold the circuit court's factual findings if there is any evidence that reasonably supports them.  *See Harleysville Grp. Ins. v. Heritage Cmtys., Inc.*, 420 S.C. 321, 333, 803 S.E.2d 288, 294 (2017) ("In an action at law tried without a jury, the appellate court will not disturb the [circuit] court's findings of fact unless there is no evidence to reasonably support them." (quoting *Auto Owners Ins. Co. v. Newman*, 385 S.C. 187, 191, 684 S.E.2d 541, 543 (2009))); *id.* ("Indeed, this [c]ourt's scope of review 'is limited to correcting errors of law.'" (quoting *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 382 S.C. 535, 543, 677 S.E.2d 574, 578 (2009))).  "This [c]ourt reviews all questions of law de novo."  *Fesmire v. Digh*, 385 S.C. 296, 302, 683 S.E.2d 803, 807 (Ct. App. 2009).

## I.    Consideration

We uphold the circuit court's finding that there was sufficient consideration for Stewart's guarantee because the evidence reasonably supports this finding.  *See Harleysville*, 420 S.C. at 333, 803 S.E.2d at 294.  The key language in Griffith's January 16, 2013 email to Stewart was "I am happy to lend the $200,000 to you *if* you will personally guarantee the loan." (emphasis added).  In light of all the other evidence in the record, the circuit court reasonably interpreted Griffith's language as

---

[1] *See Chambers v. Pingree*, 351 S.C. 442, 449, 570 S.E.2d 528, 532 (Ct. App. 2002) (holding that an action to recover on a promissory note is an action at law); *Crafton v. Brown*, 346 S.C. 347, 351, 550 S.E.2d 904, 905 (Ct. App. 2001) ("An action to collect on a guaranty is an action at law.").

a promise to extend the Note's maturity date in exchange for Stewart's personal guarantee of the debt's payment.[2]

Consideration is defined in California's Civil Code as any benefit conferred, or agreed to be conferred, on the other party, or any prejudice suffered, or agreed to be suffered, as an inducement to the other party. Cal. Civ. Code § 1605 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.). Further, in interpreting a contract,

> "'[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs. On the other hand, [i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in

---

[2] In its order, the circuit court discussed the parties' exchange of promises in both the Findings of Fact section and the Conclusions of Law section. For purposes of our standard of review, we view the circuit court's interpretation of Griffith's language as a finding of fact because the key language in Griffith's email is reasonably susceptible to more than one interpretation, and the court admitted, without objection, the testimony of both parties concerning their intent underlying the January 16 email exchange. *See State v. Cont'l Ins. Co.*, 281 P.3d 1000, 1004 (Cal. 2012), *as modified* (Sept. 19, 2012) ("A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (quoting *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995), *as modified* (Oct. 26, 1995))); *City of Manhattan Beach v. Superior Ct.*, 914 P.2d 160, 169 (Cal. 1996) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (alteration removed) (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968))); *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 686 P.2d 1158, 1163 n.2 (Cal. 1984) ("Extrinsic evidence is always admissible to resolve ambiguities on the face of a contract."), *overruled on other grounds by Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669 (Cal. 1995); *O'Connor v. W. Sacramento Co.*, 207 P. 527, 536 (Cal. 1922) (holding that when extraneous evidence explaining an ambiguity in a contract is conflicting, "it becomes a question of fact for the jury, not to construe the contract, but to determine what meaning the parties themselves attached to the ambiguous terms" and "such conflict may arise from different inferences which may be drawn from undisputed facts, as well as from a dispute as to the facts themselves").

the sense in which the promisor believed, at the time of making it, that the promisee understood it.'[3] 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as *the surrounding circumstances under which the parties negotiated or entered into the contract*; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.'"

*In re Marriage of Hibbard*, 151 Cal. Rptr. 3d 553, 556–57 (Cal. Ct. App. 2013) (emphasis added) (second alteration in original) (quoting *People v. Shelton*, 125 P.3d 290, 294 (Cal. 2006)).[4] Moreover, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting*, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.) (emphasis added). Additionally, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Cal. Civ. Code § 1643 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.). We emphasize that "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.).

---

[3] Although section 1605 of the California Civil Code (defining consideration) references a promisor and a promisee, the identification of a particular party as a promisor or promisee will depend on the purpose of the legal analysis at hand. *See CRV Imperial-Worthington, LP v. Gemini Ins. Co.*, 770 F. Supp. 2d 1074, 1077 (S.D. Cal. 2010) ("Consideration can take form of a promise that is bargained for and given in exchange for an act or *return promise*." (emphasis added)); *In re Bray's Est.*, 40 Cal. Rptr. 750, 753 (Cal. Ct. App. 1964) (holding that consideration "must be an act or a *return promise*, bargained for and given *in exchange for a promise*" (emphases added)). In the present case, Stewart challenges the circuit court's interpretation of the ambiguous language in Griffith's January 16, 2013 email to Stewart; therefore, in our evaluation of this interpretation, we view Griffith as the promisor.

[4] Although the *Shelton* decision involved a criminal plea bargain, California's supreme court relied on those sections of California's Civil Code setting forth rules for gleaning the intent of the parties to a contract, Cal. Civ. Code §§ 1635–1656 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.).

Because the key language in Griffith's January 16 email is reasonably susceptible to more than one interpretation and is, therefore, ambiguous, *see supra* n. 2, it was proper for the circuit court to consider (1) the surrounding circumstances; (2) the sense in which Griffith believed, at the time of the January 16 email exchange, that Stewart understood it; and (3) the subsequent conduct of the parties. *See Hibbard*, 151 Cal. Rptr. 3d at 557 ("'If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in *the sense in which the promisor believed, at the time of making it, that the promisee understood it*.' 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as *the surrounding circumstances under which the parties negotiated or entered into the contract*; the object, nature and subject matter of the contract; and *the subsequent conduct of the parties*.'" (emphases added) (alteration removed) (quoting *Shelton*, 125 P.3d at 294).

The circuit court had before it not only the Note but also the parties' Memorandum of Understanding and several emails to show the history of the parties' dealings. Therefore, the circuit court's determination of the intent underlying Griffith's January 16 email was not made in a vacuum, nor should it have been. *See id.* As expressed in the Memorandum of Understanding, the parties originally contemplated Griffith converting the short-term loan of $200,000 to a "capital contribution." However, in Griffith's January 16 email, she stated that she would not convert the short-term loan to a capital contribution. It logically follows that Griffith's statement, "I am happy to lend the $200,000 to you if you will personally guarantee the loan," was reasonably interpreted by the circuit court to mean that Griffith was promising to convert the short-term loan to a long-term loan (rather than a capital contribution) in exchange for Stewart's personal guarantee of the debt. This interpretation is consistent with not only Griffith's testimony that she considered this loan modification to extend the terms of the Note past March 31, 2013,[5] but also the evidence that Stewart continued to make interest payments to Griffith after this date.

---

[5] We acknowledge that Griffith did not propose a specific maturity date when offering to extend the loan's maturity past March 31, 2013. However, Stewart does not argue on appeal that this omission by itself diminishes the consideration for Stewart's guarantee. Rather, he argues on appeal that there was no offer to extend the maturity date whatsoever. Further, he merely argued to the circuit court that the lack of a proposed new maturity date violated the writing requirement of the California Statute of Frauds, which he does not argue on appeal.

*See Hibbard*, 151 Cal. Rptr. 3d at 557 (allowing the court to consider the subsequent conduct of the parties in interpreting ambiguous language in a contract).

It was also reasonable for the circuit court to infer from Griffith's language that her extension of the maturity date would personally benefit Stewart, given the history of the parties' communications, and serve as an inducement to Stewart to personally guarantee the debt. In executing the Note, the parties had entered into this short-term loan agreement with the understanding that part of the funds would be used to pay Stewart's salary. Therefore, when Griffith and Stewart exchanged emails on January 16, the understanding underlying their bargained-for exchange of promises was that Stewart would personally benefit from Griffith's extension of the maturity date for the Note. Griffith's testimony indicates that she believed when she wrote the January 16, 2013 email that Stewart understood she was offering to extend the Note's maturity date beyond March 31, 2013. *See* Cal. Civ. Code § 1649 (West, Westlaw through Ch. 16 of 2022 Reg. Sess.) ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."). Additionally, Stewart admitted that ISL's use of the $200,000 in part to pay his salary did, in fact, personally benefit him. *See Hibbard*, 151 Cal. Rptr. 3d at 557 ("The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as *the surrounding circumstances under which the parties negotiated or entered into the contract*; the *object*, nature and subject matter of the contract; and *the subsequent conduct of the parties*." (emphases added) (quoting *Shelton*, 125 P.3d at 294)).

Finally, even if Griffith's promise to extend the Note's maturity date may be considered "illusory," her subsequent "part performance" of the promise constituted sufficient consideration. *See Steiner v. Thaxton*, 226 P.3d 359, 366 (Cal. 2010) (stating that if the purported consideration is a promise that is illusory at the time the parties entered into the contract, the promisor's subsequent part performance constitutes "sufficient" consideration). Paragraph 7 of the Note provides that no delay or omission in enforcing the Note will constitute a waiver of the holder's rights or remedies. Further, paragraph 10 of the Note states, "No modification of this Note shall be valid or binding unless set forth in writing *signed by Holder and Maker*." (emphasis added). Here, no writing modifying the Note was signed by Griffith and ISL's agents. Therefore, despite any understanding Stewart could have gleaned from Griffith's emails, Griffith still had the legal right to demand full payment of the debt on March 31, 2013, or any time thereafter, and no delay in the Note's enforcement would absolve ISL of its obligations under the Note. In light of this continuing

obligation, Griffith's promise to extend the Note's maturity date might be considered to be illusory. Yet, she refrained from enforcing the maturity date and allowed ISL to use her money for many months after the maturity date. Therefore, this "part performance," if not full performance, constituted sufficient consideration for Stewart's personal guarantee of the debt.

Based on the foregoing, we will not disturb the circuit court's finding that there was sufficient consideration for Stewart's guarantee. *See Harleysville*, 420 S.C. at 333, 803 S.E.2d at 294 ("In an action at law tried without a jury, the appellate court will not disturb the [circuit] court's findings of fact unless there is *no* evidence to *reasonably* support them." (emphases added) (quoting *Newman*, 385 S.C. at 191, 684 S.E.2d at 543)).

## II.    Attorney's Fees

We share Stewart's concern over the circuit court's failure to articulate its reasoning in concluding that $89,160.54 represents reasonable attorney's fees. We encourage the circuit court to be mindful in all future cases of our procedural precedent requiring specific findings of fact for each factor the circuit court is required to consider in quantifying a reasonable fee award. *See Blumberg v. Nealco, Inc.*, 310 S.C. 492, 494, 427 S.E.2d 659, 661 (1993) (stating that in response to a request for attorney's fees that are "authorized by contract or statute, the court should make specific findings of fact on the record for each factor" the court is required to consider in determining a fee award). It is the responsibility of the circuit court to memorialize this analysis in writing not only to allow the reviewing court to evaluate the propriety of the award but also to demonstrate to the parties that the award is fair.

Nonetheless, in the interest of judicial economy, we affirm the amount awarded by the circuit court in this case based on our own analysis of what is reasonable given the evidence in the record. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal."); *Judy v. Judy*, 384 S.C. 634, 646, 682 S.E.2d 836, 842 (Ct. App. 2009) ("Error is harmless where it could not reasonably have affected the result of the trial.").

California law requires the court to determine "reasonable attorney's fees" to be awarded to the prevailing party in an action on a contract that provides for attorney's fees. *See* Cal. Civ. Code § 1717(a) (West, Westlaw through Ch. 16 of 2022 Reg. Sess.) ("In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract,

shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."); *id.* ("Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."). "[T]he trial court has broad authority to determine the amount of a reasonable fee." *PLCM Grp. v. Drexler*, 997 P.2d 511, 518 (Cal. 2000), *as modified* (June 2, 2000). "'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong["]' — meaning that it abused its discretion." *Id.* (quoting *Serrano v. Priest*, 569 P.2d 1303, 1317 (Cal. 1977)).

Further, "the fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." *Id.* "The lodestar figure may then be *adjusted, based on consideration of factors specific to the case*, in order to fix the fee at the fair market value for the legal services provided." *Id.* (emphasis added). "The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, *and other circumstances in the case*." *Id.* at 519 (emphasis added) (quoting *Melnyk v. Robledo*, 134 Cal. Rptr. 602, 605 (Cal. Ct. App. 1976)).

"Although the terms of the [fee] contract may be considered, they 'do not compel any particular award.'" *Id.* (quoting *Vella v. Hudgins*, 198 Cal. Rptr. 725, 728 (Cal. Ct. App. 1984)). For example, in *All-West Design, Inc. v. Boozer*, the defendant, who held a promissory note that was the subject of a cross-claim, retained his attorney on a contingency fee basis. 228 Cal. Rptr. 736, 744 (Cal. Ct. App. 1986). The California Court of Appeals, Fifth District, held that the trial court did not need to "award *exactly* the one-third rate to which [the defendant] and his attorney agreed." *Id.* Rather, "[t]he court's decision must be based upon reasonableness" pursuant to section 1717. *Id.* Certainly, it is reasonable to allow some enhancement to the lodestar to compensate counsel for taking on the risk of not being compensated in the event of a loss on the merits of the case. *Cf. Ketchum v. Moses*, 17 P.3d 735, 741–42 (Cal. 2001) (approving of the superior court's use of the lodestar method in determining an attorney's fee award under a fee-shifting statute in free speech cases; discussing the contingent nature of the fee as a factor in that determination; and explaining that a fee enhancement in contingency cases compensates the attorney for not only his or her legal services but also for bearing the risk of not being paid).

Here, Griffith entered into a one-third contingency fee agreement with counsel. At the damages hearing, counsel requested an attorney's fee award of $110,000 (one-third of Griffith's $330,000 damages award). Counsel also submitted a billing summary to show his expenses and the total fees he would have charged had he billed Griffith on an hourly basis. The summary showed $1,874.54 for expenses and $66,286.00 for fees, based on hourly rates of $300 for lead counsel, $175 for his associate, and $80 for his paralegal. These hourly rates and the number of hours spent on the case, as reflected in counsel's billing summary, are reasonable. Therefore, we begin with a lodestar of $66,286.00.

Next, we look to the unique circumstances of this case to determine whether an enhancement to the lodestar is justified. Given Griffith's contractual fee obligation to counsel, a fee award of less than $110,000 will require Griffith to pay the difference to counsel out of her damages award. This amount would be $43,714 were we to allow no enhancement to the lodestar.

We conclude that an enhancement is justified because it is appropriate to compensate counsel for bearing the risk of not being paid in the event of a loss on the merits of the case. Further, given Stewart's role in requiring Griffith to hire counsel, it is reasonable to require Stewart to pay at least one-half of the $43,714 difference between the lodestar ($66,286) and counsel's actual fee ($110,000), which is $21,857, in addition to his payment of the lodestar and counsel's expenses. This roughly aligns with the circuit court's award for attorney's fees and expenses, $89,160.54, because the award is exactly $21,000 higher than the amount indicated in counsel's billing for fees plus expenses, $68,160.54. The extra $21,000 is slightly less than half of the $43,714 difference between the lodestar ($66,286) and counsel's actual fee ($110,000), which is $21,857.

In sum, we view the amount of fees awarded as reasonable because the award justifiably enhances the lodestar but not excessively so.

## III.    Judgment Interest

Stewart contends that the circuit court's specification of a 9.5 percent interest rate on the judgment for Griffith conflicts with section 34-31-20 of the South Carolina Code (2020), which governs the legal rate of interest on money judgments. We agree with Stewart that the statute's connection of the judgment interest rate to the prime rate means that the statutory rate is variable and the circuit court did not have the authority to specify a 9.5 percent interest rate. *Cf. Small v. Pioneer Mach., Inc.*, 330 S.C. 62, 65, 496 S.E.2d 884, 886 (Ct. App. 1998) ("Post-judgment

interest . . . accrues on all judgments until the judgment amount has been properly deposited with the court pursuant to Rule 67, SCRCP. It is the final tender of the money to the court, rather than the filing of a motion requesting the court's permission to do so, which stays the accrual of interest. Thus, the trial court was without discretion to vary the statutory interest rate for the period of time between [the judgment debtor's] motion and the court's order." (citation omitted)).

Nonetheless, the statutory rate does not apply to a case in which the parties themselves have a written agreement fixing a different interest rate. *See Sears v. Fowler*, 293 S.C. 43, 45, 358 S.E.2d 574, 575 (1987) ("Despite the mandatory tenor of the statutory language,[6 section 34-31-20] does not automatically apply in every case. The statute does not apply, for example, to judgments when the parties have contracted for a different rate."); *Turner Coleman, Inc. v. Ohio Const. & Eng'g, Inc.*, 272 S.C. 289, 292, 251 S.E.2d 738, 740 (1979) ("Section 34-31-20, fixing the interest rate on money judgments or decrees, applies only in the absence of a written agreement between the parties fixing a different rate of interest. Stated differently, if a contract has . . . specified a lawful rate of interest to be paid after maturity, the same rate will apply on the judgment entered on the contract."). Here, the Note specifies a post-default interest rate of 13.5 percent. Therefore, this rate controls the accrual of interest on the judgment in this case, and the circuit court's specification of a 9.5 percent rate must be reversed.

## CONCLUSION

Based on the foregoing, we affirm both the circuit court's finding that there was sufficient consideration for Stewart's guarantee and the court's award of attorney's fees. We reverse the specification of a 9.5 percent rate for post-judgment interest.

**AFFIRMED IN PART AND REVERSED IN PART.**

**GEATHERS and HILL, JJ., and LOCKEMY, A.J., concur.**

---

[6] Although the statute was amended in 2005 to provide for a rate tied to the prime rate, the mandatory language referenced in *Sears* was not changed. *See* Act No. 27, Preamble, 2005 S.C. Acts 108; *id.* at 119; *Edwards v. Campbell*, 369 S.C. 572, 578, 633 S.E.2d 514, 517 (2006) (noting the changes effected by the 2005 amendment to section 34-31-20(B)).